ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Plaintiff Norman Whitt, Jr., as the administrator of the Estate of Norman Whitt, Sr. ("Whitt"), brings this action against defendant Kaleida Health ("Defendant" or "Kaleida Health"), for claims arising out of Whitt's employment at Kaleida Health. (See Dkt. 20). Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. 23). For the reasons set forth below, Defendant's motion is granted in its entirety.
BACKGROUND
I. Factual Background
The summary judgment evidence shows the following facts, which are undisputed unless otherwise noted.
Defendant, a health care provider in Western New York, was formed in 1998 after the merger of various health care entities, including Buffalo General Hospital. (Dkt. 23-1 ("Def. Stmt.") at ¶¶ 1-2; Dkt. 29 ("Whitt Stmt.") at ¶ 3).[1] The integration of various hospitals into the Kaleida Health system occurred over a number of years, and the majority of incumbent staff transitioned during 1999 and early 2000. (Def. Stmt. at ¶ 2).
Whitt, an African American, began working for Buffalo General Hospital on June 17, 1985. (Dkt. 20 at ¶ 6; Def. Stmt. at ¶ 3; Whitt Stmt. at ¶ 3). He began working for Kaleida Health in its Clinical Engineering Department on July 1, 1999. (Def.
*561 Stmt. at ¶ 3; see Whitt Stmt. at ¶ 3). At all times working as a Clinical Engineering Specialist, Whitt reported to Peter Castronova ("Castronova"), who is the Manager of Clinical Engineering. (Def. Stmt. at ¶ 4; Whitt Stmt. at ¶ 4). During his employment, Whitt's position was referred to by different names, such as "Physiological Equipment Specialist and Physiological Data Specialist," but the job duties remained the same. (Def. Stmt. at ¶ 4 n.1; Whitt Stmt. at ¶ 4).
The Clinical Engineering Department oversees the distribution and maintenance of various pieces of medical equipment throughout the Kaleida Health system. (Def. Stmt. at ¶ 13). Castronova oversaw the daily management and operation of the Clinical Engineering Department, including setting work priorities. (Id. ). The various positions within the department, all of whom reported to Castronova, were as follows: Clinical Engineering Specialists; Senior Biomedical Equipment Technicians; Biomedical Equipment Technicians; and Network Cable Specialists. (Def. Stmt. at ¶ 14). It is not clear from the record how each of those positions differed from each other, if at all. For example, Defendant asserts-and Whitt does not dispute-that "there were several areas of overlap" between the jobs of Clinical Engineering Specialist and Senior Biomedical Technicians, although the Senior Biomedical Technicians had different responsibilities. (Def. Stmt. at ¶ 67; see Pl. Stmt. at ¶ 67).
Whitt took extended medical leaves of absence during his employment, including the following: (1) October 2000 to February 2003; (2) September 30, 2005, to August 6, 2007; (3) January 24, 2008, to February 4, 2008; and (4) February 21, 2008, to March 18, 2008. (Def. Stmt. at ¶ 5). Whitt did not return from a final medical leave of absence that began on September 30, 2009. (Id. ).
A. Disparate Pay Claim
The following facts are relevant to Plaintiff's disparate pay claim.
1. Overall Seniority of Clinical Engineering Specialists and Comparators
Whitt was the third-most senior Clinical Engineering Specialist, based on the date that he was hired by a predecessor to Kaleida Health, which was June 17, 1985. (Def. Stmt. at ¶ 44; Pl Stmt. at ¶ 44; Dkt. 23-17 at ¶¶ 31-32). Two individuals, both Caucasian Clinical Engineering Specialists, had several years' more overall seniority than Whitt: Bruce Kovach ("Kovach"), whose seniority date was January 23, 1968, and Robert Sobkowiak ("Sobkowiak"), whose seniority date was August 11, 1971. (Def. Stmt. at ¶ 44; Pl Stmt. at ¶ 44; Dkt. 23-17 at ¶¶ 31-32). The remainder of the Clinical Engineering Specialists-who, with the exception of Debra Fayson ("Fayson"), were Caucasian-had less seniority than Whitt. (Def. Stmt. ¶ 44; Pl Stmt. ¶ 44; Dkt. 23-17 at ¶¶ 31-32; Dkt. 35-12 at ¶ 22).
As discussed below, the parties dispute whether three individuals are comparators: Rick Seaton ("Seaton"), Douglas Bellanti ("Bellanti"), and John Wisniewski ("Wisniewski"). Seaton, having been hired by a predecessor to Kaleida Health in April of 1981, had more overall seniority than Whitt. (Def. Stmt. at ¶ 66; Pl. Stmt. at ¶ 50; Dkt. 23-17 at ¶ 50). Bellanti's overall seniority date is not entirely clear from the record, but a Kaleida Health performance assessment lists his "hire date" as January 8, 1991. (Dkt. 29-3 at 2). John Wisniewski, whose seniority date was February 13, 1995, was less senior than Whitt. (Def. Stmt. at ¶ 44; Pl. Stmt. at ¶¶ 44, 54; Dkt. 35-12 at ¶ 22).
2. Historical Pay Rates
When Whitt returned from medical leave on February 9, 2003, his rate of pay *562 was $25.15 per hour. (Dkt. 23-15 at 2). At that time, two individuals earned more than Whitt: Kovach, who earned $26.12 per hour, and Wisniewski, who earned $25.56 per hour. (Id. at 2, 3). Two less-senior Caucasian Clinical Engineering Specialists earned the same rate of pay as Whitt: Anthony Sebastiano ("Sebastiano") and Jeffrey Ward ("Ward"). (Id. at 1, 3). Six Clinical Engineering Specialists earned less than Whitt: (1) Sobkowiak, who is Caucasian, earned $24.67 per hour; (2) John Perusich ("Perusich"), who is Caucasian, earned $24.50 per hour; (3) Fayson, who is African American, earned $23.54 per hour; (4) Mark Wujek ("Wujek"), who is Caucasian, earned $24.01 per hour; (5) Scott Schultz ("Schultz"), who is Caucasian, earned $24.50 per hour; and (6) Kenneth Cerra ("Cerra"), who is Caucasian, earned $23.08 per hour. (Id. at 1-4).
On June 1, 2003, some employees, excluding Fayson and Schultz, received pay raises. (Dkt. 23-15 at 1-5). As a result of this pay raise, Whitt earned $25.67 per hour. (Id. at 2). At that time, three individuals, all Caucasian, earned more than Whitt: Kovach, who earned $27.43 per hour; Sobkowiak, who earned $25.90 per hour; and Wisniewski, who earned $26.07 per hour. (Id. at 2, 3, 5). Two individuals, both Caucasian, earned the same rate of pay as Whitt: Sebastiano and Ward. (Id. at 1, 3). Five individuals earned less than Whitt: (1) Perusich, who earned $24.99 per hour; (2) Fayson, who did not receive a raise and still earned $23.54 per hour; (3) Wujek, who earned $24.49 per hour; (4) Schultz, who did not receive a raise and still earned $24.50 per hour; and (5) Cerra, who earned $23.54 per hour. (Id. at 1-4).
On May 16, 2004, most employees, excluding Fayson, received pay raises. (Id. at 1-5). As a result of this pay raise, Whitt earned $26.19 per hour. (Id. at 2). At that time, two individuals earned more than Whitt: Kovach, who earned $27.98 per hour, and Sobkowiak, who earned $26.43 per hour. (Id. at 2, 5). Once again, Sebastiano and Ward earned the same rate of pay as Whitt. (Id. at 1, 3). Five individuals earned less than Whitt: (1) Perusich, who earned $25.49 per hour; (2) Fayson, who did not receive a raise and still earned $23.54 per hour; (3) Wujek, who earned $24.98 per hour; (4) Schultz, who earned $24.99 per hour; and (5) Cerra, who earned $24.01 per hour. (Id. at 1-4). Wisniewski, who earned $26.60 per hour, had a higher rate of pay than Whitt at that time. (Id. at 3). According to Kaleida Health, before the raises went into effect on May 16, 2004, Wisniewski transitioned from a "Specialist" to the title of Cardiopulmonary Equipment Specialist. (See Dkt. 35-7 at 4-5 (Wisniewski's performance evaluation, dated May 10, 2004, showing title of "Cardiopulmonary Equipment Specialist"), 6-7 (Wisniewski's performance evaluation, dated March 23, 2003, showing title of "Specialist") ). Defendant argues that Wisniewski was therefore no longer a comparator. (See Dkt. 35 at ¶ 11). However, Defendant's record of salary histories reflects only one job code and title, which are the same as Whitt's: Clinical Engineering Specialist, with job code 532000. (Dkt. 23-15 at 3). Also, Castronova remained as Whitt's supervisor. (Dkt. 35-7 at 4, 6).
On May 1, 2005, employees received pay raises. At that time, Whitt earned $26.98 per hour. (Dkt. 23-15 at 2). Once again, Kovach and Sobkowiak, both Caucasian, earned more than Whitt; Kovach earned $28.82 per hour, and Sobkowiak earned $27.22 per hour. (Id. at 2, 5). Also once again, Sebastiano and Ward earned the same pay rate as Whitt. (Id. at 1, 3). Five individuals earned less than Whitt: (1) Perusich, who earned $26.25 per hour; (2) Fayson, who earned $24.25 per hour; (3) Wujek, who earned $25.73 per hour; (4) Schultz, who earned $25.74 per hour; and (5) Cerra, who earned $24.73 per hour. ( *563 Id. at 1-4). Wisniewski earned $27.40 per hour, which was more than Whitt. (Id. at 3).
On June 6, 2005, George Militello ("Militello"), who is Caucasian, entered the position of Clinical Engineering Specialist and earned $26.85 per hour. (See id. at 4). On September 19, 2005, Frank Sacco ("Sacco"), who is Caucasian, entered the position of Clinical Engineering Specialist and earned $24.73 per hour. (See id. ). Both Militello and Sacco earned less than Whitt when they entered the position. (See id. at 2, 4).
On April 30, 2006, employees received pay raises. At that time, Whitt's rate of pay increased to $28.06, although he was on an extended leave of absence at that time. (See id. at 2). As before, Kovach and Sobkowiak earned more than Whitt; Kovach earned $29.97 per hour, while Sobkowiak earned $28.31 per hour. (Id. at 2, 5). Also as before, Sebastiano and Ward had the same rate of pay as Whitt. (Id. at 1, 3). The following employees had pay rates that were less than Whitt's: (1) Perusich, who was paid $27.30 per hour; (2) Fayson, who was paid $25.22 per hour; (3) Sacco, who was paid $25.72 per hour; (4) Militello, who was paid $27.92 per hour; (5) Wujek, who was paid $26.76 per hour; (6) Schultz, who was paid $26.77 per hour; and (7) Cerra, who was paid $25.72 per hour. (Id. at 1-4). Wisniewski was paid $28.50 per hour, which was more than Whitt earned at that time. (Id. at 3).
On April 29, 2007, employees, excluding Whitt, receive pay raises. At that time, Whitt was on an extended leave of absence, and his rate of pay remained stagnant at $28.06 per hour. (Id. at 2). The following six employees had rates of pay higher than Whitt's: (1) Kovach, who was paid $31.03 per hour; (2) Sobkowiak, who was paid $29.30 per hour; (3) Perusich, who was paid $28.26 per hour; (4) Sebastiano, who was paid $29.05 per hour; (5) Militello, who was paid $28.91 per hour; and (6) Cerra, who was paid $28.30 per hour. (Id. at 1-5). Wisniewski earned $29.50 per hour, which was also more than Whitt at that time. (Id. at 3). The following four employees had rates of pay lower than Whitt's: (1) Fayson, who earned $26.11 per hour; (2) Wujek, who earned $27.70 per hour; (3) Schultz, who earned $27.71 per hour; and (4) Sacco, who earned $26,62 per hour. (Id. at 1-4).
Those rates of pay for Whitt's co-workers were in effect when Whitt returned from an extended leave of absence on August 7, 2007. (See id. at 1-5). According to Defendant, "[d]espite the near two-year absence from the workplace, in 2007, Whitt's salary increased to $29.18 per hour when he returned, an increase of 8.15%." (Def. Stmt. at ¶ 53; Dkt. 23-17 at ¶ 38). Whitt does not specifically disagree with this factual assertion, but points out that "Kaleida represents that Mr. Whitt's hourly was $29.18 even though its own Exhibit M shows that his hourly rate was only $28.06." (Pl. Stmt. at ¶ 53). That exhibit shows salary histories only through April 29, 2007. (Dkt. 23-15). Defendant also cites the declaration of Susan Passmore, Human Resources Director, as evidentiary support. (Dkt. 23-17 at ¶¶ 1, 38). Moreover, among Defendant's exhibits submitted in reply is a printout showing Whitt's pay rate history, including his rate of pay in effect on August 7, 2007. (Dkt. 35-8). According to that document, Whitt's rate of pay was increased to $29.18 per hour as of April 29, 2007. (Id. ).
Whitt also asserts that Seaton and Bellanti are comparators. (See Dkt. 29 at 5; Dkt. 30 at 10). Defendant included neither Seaton nor Bellanti with the comparators in its original moving papers. (See Def. Stmt. at ¶ 44).
According to Defendant, although Bellanti held the position of Clinical Engineering *564 Specialist until November 5, 2000, he later had a different title-Clinical Lab Instrument Specialist-with a different job code. (Dkt. 29-3 at 3-4 (Bellanti's April 2005 performance assessment showing title of "Clinical Lab Equipment Specialist"), 5 (July 2004 letter offering Bellanti position of "Clinical Lab Instrument Specialist"), 6 (July 2004 email showing Bellanti's title of Clinical Lab Instrument Specialist and job code); Dkt. 35-5 (Defendant's Reply exhibit showing different job code as of November 5, 2000) ). Bellanti's rate of pay was higher than Whitt's, but Defendant maintains that the reason for the higher pay rate was that it was necessary to recruit Bellanti back to Kaleida Health after he had left Kaleida Health for a period of time. (Dkt. 29-3 at 8-10 (emails discussing salary offer necessary to recruit Bellanti); Dkt. 35 at ¶ 7; Dkt. 35-6 at 3 (showing history of Bellanti's pay rates as consistently higher than Whitt's) ).
Defendant argues in its reply papers that Rick Seaton was not included as a comparator because he did not hold the position of Clinical Engineering Specialist until July 8, 2007; before that, his title was "Senior Technician Biomed Equipment." (Dkt. 35 at ¶ 6; see also Dkt. 34-5 at 1 (showing Seaton as having Clinical Engineering Specialist job code as of July 8, 2007) ). When Seaton entered the position of Clinical Engineering Specialist in July of 2007, his pay rate was $29.54 per hour, which was higher than Whitt's at that time. (Compare Dkt. 34-5 at 2 (Seaton's pay rate history), with Dkt. 35-8 at 2 (Whitt's pay rate history) ). Furthermore, Seaton's pay rate had been consistently higher than Whitt's when Seaton was in the position of Senior Technician Biomed Equipment. (Compare Dkt. 34-5 at 2, with Dkt. 35-8 at 2). Defendant states that, "[w]hile [Seaton's] pay when he entered into the position was slightly higher than Whitt's, he did not receive a pay raise at the time of his promotion, waiting nearly a year until his next raise." (Dkt. 35 at ¶ 6).
B. Reduction in Job Duties Claim
The following facts are relevant to Whitt's claim of racial discrimination based on a reduction in job duties.
Defendant maintains that Whitt had no direct reports, but Whitt disputes this as misleading based on his position description, certain email exchanges, and a past performance assessment. (Def. Stmt. at ¶ 14; Whitt Stmt. at ¶ 14). Whitt contends that, although his position description states that he did not have any subordinate staff (see Dkt. 23-12 (Ex. J, position description) ), it also states that the position requires leadership "[c]onsistent with experience and opportunity" and that he must "[p]erform instructional activities that will assist other biomedical technicians in learning and performing preventive maintenance procedures and corrective troubleshooting and repair processes" and "[m]entor[ ] and instruct[ ] junior personnel ...." (Id. ). He also points to email exchanges with other employees, suggesting that those employees received instructions from and reported to him. (Whitt Stmt. at ¶ 14; see Dkt. 29-6 (email exchanges) ). Whitt also points to a 2005 performance assessment in which Defendant identified "managerial skills training" as an area of development for Whitt. (Whitt Stmt. at ¶ 14; Dkt. 23-11 (Ex. I, performance assessment) ).
A disciplinary incident in September 2005 preceded an alleged reduction in Whitt's job duties. Kaleida Health was expecting a shipment of beds to arrive on September 23, 2005. (Def. Stmt. at ¶ 55; Whitt Stmt. at ¶ 55). The beds required preventative maintenance checks. (Def. Stmt. at ¶ 55; Whitt Stmt. at ¶ 55). By email on September 15, 2005, Whitt asked Castronova for two or three additional employees *565 to assist Whitt with the preventative maintenance checks. (Whitt Stmt. at ¶ 55; Dkt. 23-8 at 6 (Email to Castronova) ). Castronova assigned one additional staff member to assist Whitt. (Def. Stmt. at ¶ 55; Whitt Stmt. at ¶ 55; Dkt. 23-8 at 4-6). On September 22, 2005, one day before the beds' arrival, a confrontational telephone conversation took place between Whitt and Castronova, although the parties disagree on the details of the exchange. (Def. Stmt. at ¶¶ 55-57; Whitt Stmt. at ¶¶ 55-61).
According to Castronova, Whitt called Castronova and asked for additional assistance with the preventative maintenance checks. (Dkt. 23-10 at 1). Whitt explained that another employee was off work in the morning when the checks needed to begin, and that Whitt had a number of other projects to attend to at the same time. (Id. ). Castronova alleges that Whitt became agitated, and Castronova told Whitt that the preventative maintenance checks were his only priority for the next day and that Castronova would attend to other service calls at that time. (Id. ). Castronova further alleges that Whitt "became very loud and uncooperative stating that he was simply giving [Castronova] the courtesy of telling what was going on." (Id. ). Castronova alleges that he asked Whitt to confirm whether he understood the instructions, and Whitt responded, "Peter, do you know who [you're] talking to, I ain't no kid!" (Id. ). Whitt allegedly hung up on Castronova. (Id. ).
Whitt presents a competing version of the phone call, as documented in a complaint to Human Resources. According to Whitt, he did not tell Castronova that he could not attend the preventative maintenance checks; rather, he stated that he may have to leave if "something comes up that is priority." (Dkt. 23-8 at 2; Whitt Stmt. at ¶ 56). Whitt alleges that Castronova asked what Whitt considered his priority to be, and when Whitt answered, "Nurse Station Monitor failures, Telemetry units, etc.," Castronova became annoyed and loudly told Whitt to do the preventative maintenance checks. (Dkt. 23-8 at 2; Whitt Stmt. at ¶ 56). Whitt responded that he was just informing Castronova about potential issues, and Castronova demanded that Whitt answer him "yes or no" as to whether he would do the preventative maintenance checks. (Dkt. 23-8 at 2; Whitt Stmt. at ¶ 56). Whitt felt that comment was disrespectful and demeaning. (Dkt. 23-8 at 2; Whitt Stmt. at ¶ 56).
On the day of the beds' arrival, Whitt was present for the beginning of the preventative maintenance checks, but he later left. (Def. Stmt. at ¶ 59; Whitt Stmt. at ¶ 59). Whitt maintains that he did so because an additional employee was there to help with the assignment, so Whitt went to attend to other tasks. (Whitt Stmt. at ¶ 59; Dkt. 23-8 at 3). On September 26, 2005, Defendant issued Whitt a written warning for insubordination, alleging that Whitt engaged in "[a]busive language" toward his supervisor and [n]on-professional communication and phone etiquette," and did not "perform reasonable requests of a supervisor" by not following Castronova's direction to remain through the completion of the preventative maintenance checks. (Dkt. 23-10 at 1; Def. Stmt. at ¶ 60; see Whitt Stmt. at ¶ 60). According to the written warning, Whitt was "immediately removed from his current area of responsibility until further notice." (Dkt. 23-10 at 1). Defendant maintains that "Castronova decided to move responsibility for coordinating requests for services and workflow at Buffalo General Medical Center from a single person, which had been Whitt, to the entire group of Clinical Engineering Specialists working at the site," such that Whitt shared the responsibility with the other Clinical Engineering Specialists.
*566 (Def. Stmt. at ¶ 62). Indeed, in its answer to Whitt's complaint, Defendant "admits that, as a result of a written warning issued on September 30, 2005 based on Plaintiff's insubordinate behavior, Plaintiff was removed from serving as 'point person' ...." (Dkt. 4 at 6). According to Whitt, he was relegated to processing paperwork, based on an email from Castronova instructing Whitt to "transfer all outstanding work activity to Bob Kawalerski" and to "catch up on all work order documentation" as his assignment for the following day. (Dkt. 29-9).
On October 13, 2005, Whitt submitted a problem resolution request concerning the incident involving the preventative maintenance checks. (Dkt. 23-8). He claimed that he was suffering "disparity, harassment and abusive language" from Castronova. (Id. at 2). In it, Whitt recounted his version of the incident and requested that Castronova withdraw the "bogus" written warning. (Id. at 3). Whitt also stated that Castronova was hostile to him, disliked him, and had never treated him fairly. (Id. ). Whitt requested that "someone come[ ] in to take a look at this situation as well as speak to other African Americans regarding how [Castronova] is treating them." (Id. ).
II. Procedural Background
On June 16, 2015, Plaintiff filed the instant action in this Court, after the EEOC issued a determination, dated September 3, 2009, that there was reason to believe that violations of Title VII had occurred, followed by a right-to-sue letter dated March 17, 2015. (Dkt. 1). Defendant filed an answer on August 12, 2015. (Dkt. 4). On October 26, 2016, Plaintiff moved to amend the complaint and caption on the basis that, when the complaint was filed, the name of the administrator of Whitt's estate was omitted by oversight. (Dkt. 18). Magistrate Judge Foschio granted the motion (Dkt. 19), and Plaintiff filed an amended complaint that, inter alia , changed the caption and some references to Mr. Whitt in certain paragraphs. (Dkt. 20).
Defendant moved for summary judgment on March 14, 2017. (Dkt. 23). Plaintiff responded on May 5, 2017. (Dkt. 29 (Response); Dkt. 30 (Memorandum) ). Defendant replied on May 23, 2017. (Dkt. 35). Oral argument was held before the undersigned on November 27, 2017, at which time the Court directed the parties to submit post-hearing letter briefs and reserved decision. (Dkt. 38). Whitt timely filed his letter brief on December 7, 2017 (Dkt. 39), and Defendant timely filed its letter brief on December 18, 2017 (Dkt. 40).
DISCUSSION
I. Standard of Review
Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts....[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial ." Caldarola v. Calabrese , 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. , 475 U.S. at 586-87, 106 S.Ct. 1348 ). "[T]he mere existence of some alleged factual dispute *567 between the parties will not defeat an otherwise properly supported motion for summary judgment...." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
II. Abandoned and Newly-Raised Claims
Whitt's Amended Complaint raises the following claims: (1) race discrimination, which included "a lower pay rate, a demeaning work location, being denied promotions, training and overtime opportunities, and being subjected to undeserved discipline, including without limitation, written warning and demotion, and he was assaulted and subjected to verbal abusive language" (Dkt. 20 at ¶ 16); and (2) retaliation that ensued after he filed his EEOC charge in December 2005 (id. at ¶¶ 23-24). He asserts two causes of action: discrimination and retaliation in violation of Title VII (id. at ¶¶ 25-30), and discrimination and retaliation in violation of NYSHRL (id. at ¶¶ 31-35).
In its summary judgment motion, Defendant raises three primary arguments: (1) Whitt failed to exhaust administrative remedies regarding his race discrimination claims arising out of failure to promote, denial of training and overtime, a demeaning work location, and pay disparity; (2) Defendant is entitled to summary judgment on Whitt's race discrimination claims-including failure to promote, denial of training and overtime, pay disparity, a demeaning work location, undeserved discipline, and abusive language; and (3) Defendant is entitled to summary judgment on his retaliation claims. (Dkt. 23-19 at 6-24).
In opposition to summary judgment, Whitt characterizes his complaint as asserting the following:
Whitt ...brings this race discrimination, hostile work environment and retaliation claim for unequal pay compared to Caucasian comparators, a material reduction in job duties as the result of a scheme by his supervisor, Peter Castronova, harassment by Mr. Castronova and retaliation resulting in the loss of all of Mr. Whitt's job duties.
(Dkt. 30 at 1). He argues that he exhausted his administrative remedies with respect to a race-based pay disparity claim. (Id. at 3-5). He then argues that he "put forth sufficient evidence to establish that race was a motivating factor in the adverse employment actions taken against [him] and that he endured a racially hostile work environment." (Id. at 6). His argument that he can establish a prima facie case of race discrimination focuses on his disparate pay claim, as well as his claim that he experienced a material reduction in duties. (See id. at 7-15). Next, he argues that he can establish a hostile work environment claim "based on his allegations of repeated disparate and rude treatment at the hands of Mr. Castronova." (Id. at 21). Finally, he addresses his retaliation claim, which he characterizes as follows: "Following discovery , Mr. Whitt's retaliation allegations narrowed to his July 2005 complaint to Mr. Castronova and the removal of his supervisory preventative maintenance duties and then the removal of all of his 'areas of responsibility.' " (Id. at 23 (emphasis added) ).
A. Abandoned Race Discrimination Claims
First, as Defendant rightly argues in reply (Dkt. 35-12 at 1-2), Whitt has abandoned certain race discrimination claims that he had asserted in his amended complaint by failing to address them in opposition to Defendant's motion for summary judgment. Where, as here, a counseled non-moving party submits "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others," the Court may *568 deem that the response is "an abandonment of the unmentioned claims." Jackson v. Fed. Exp. , 766 F.3d 189, 195 (2d Cir. 2014) ; see also Camarda v. Selover , 673 Fed.Appx. 26, 30 (2d Cir. 2016) (concluding that employee abandoned hostile work environment and retaliation claims where opposition brief argued only that summary judgment should be denied as to her discrimination claims); Taylor v. City of New York , 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").
Because Whitt's opposition brief addresses only (1) his race discrimination claim arising out of an alleged pay disparity, (2) his race discrimination claim arising out of a material reduction in job duties, (3) a hostile work environment claim, and (4) retaliation following a July 2005 complaint, Whitt has abandoned his race discrimination claims arising out of "a demeaning work location, being denied promotions, training and overtime opportunities, and being subjected to undeserved discipline, including without limitation, written warning and demotion, and he was assaulted and subjected to verbal abusive language" (Dkt. 20 at ¶ 16). Thus, the Court does not consider those abandoned race discrimination claims.
B. Newly Raised Hostile Work Environment Claim
Second, nowhere in Whitt's complaint does he allege a claim of "hostile work environment," as he attempts to do in opposition to summary judgment. Raising a new claim for the first time in opposition to summary judgment is inappropriate. See Lyman v. CSX Tramp., Inc. , 364 Fed.Appx. 699, 701 (2d Cir. 2010) (finding district court did not abuse discretion in declining to consider new theories of liability raised for the first time in opposition to summary judgment); Greenidge v. Allstate Ins. Co. , 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach merits of argument raised for first time in opposition to summary judgment); Syracuse Broad. Corp. v. Newhouse , 236 F.2d 522, 525 (2d Cir. 1956) (holding that district court was "justified" in "brush[ing] aside" further argument not alleged in complaint but raised for first time in opposition to summary judgment). Accordingly, the Court does not consider Whitt's belatedly raised hostile work environment claim.
C. Abandoned and Newly Raised Retaliation Claims
Third, Defendant rightly argues (Dkt. 32-12 at 7-9) that Whitt's opposition brief fails to address the retaliation claim that he actually pleaded in his amended complaint-based on the filing of his EEOC charge-and argues, for the first time, that he experienced retaliation based on a July 2005 complaint to Castronova. (See Dkt. 20 ¶¶ 23-24 (amended complaint alleging retaliation based on filing EEOC charge); Dkt. 30 at 23-25 (claiming that retaliation claim is based on a July 2005 complaint to Castronova) ).
Whitt's post-hearing letter brief argues that he alleged the latter retaliation claim in his amended complaint; in his view, paragraphs 18 and 19 alleged that "in 2005, after he lost some job duties, he complained to human resources about treatment from his supervisor, but nothing was done." (Dkt. 39 at 1). Paragraphs 18 and 19-set forth in the section of his complaint entitled "Race Discrimination Against Mr. Whitt" (Dkt. 20 at 3) rather than the section entitled "Retaliation" (id. at 5)-state as follows:
18. Mr. Whitt lost additional duties after he returned to work and this continued in 2005. Mr. Rick Seaton, displaced from Brooks Memorial *569 Hospital, was brought to Buffalo General Hospital and placed into a Senior Tech position that supervised a Preventative Maintenance team throughout the Kaleida system. Prior to this, Mr. Whitt and other techs performed PM duties.
19. Mr. Whitt was treated differently in regards to treatment and receiving respect. Mr. Peter Castronova, the Corporate Manager for Clinical Engineering, on numerous occasions, became irate with Mr. Whitt and cursed and screamed at him. Mr. Castronova did not treat the Caucasian Specialist in this manner. Mr. Whitt communicated his concerns to the Human Resources Department, but nothing was done .
(Id. at ¶¶ 18-19 (emphasis added) ).
Those paragraphs' reference to Whitt's complaint to Human Resources, made at an unspecified time, is insufficient to allege a claim of retaliation. Whereas he explicitly asserts that he "filed a complaint with the EEOC in December, 2005 regarding discrimination" and "was retaliated against as a direct result of the complaint" (id. at ¶ 23), Whitt sets forth no equivalent allegations with respect to his July 2005 complaint to Castronova as set out in his opposition brief (see id. ). This is insufficient to state a claim of retaliation arising out of the July 2005 complaint. See Lewis v. City of Norwalk , 562 Fed.Appx. 25, 29 (2d Cir. 2014) ("To succeed on a retaliation claim ... the plaintiff bears the initial burden of establishing a prima facie case by showing: '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.' " (quoting Hicks v. Baines , 593 F.3d 159, 164 (2d Cir. 2010) ). Indeed, Whitt's opposition brief seems to concede that the retaliation claim is newly raised: "Following discovery . Mr. Whitt's retaliation allegations narrowed to his July 2005 complaint to Mr. Castronova and the removal of his supervisory preventative maintenance duties and then the removal of all of his 'areas of responsibility.' " (Dkt. 30 at 23 (emphasis added) ).
Thus, Whitt has not only abandoned his retaliation claim based on the EEOC charge, but he has also inappropriately raised the retaliation claim arising out of his July 2005 complaint to Castronova for the first time in opposition to summary judgment. As a result, the Court does not consider that retaliation claim. See Lyman , 364 Fed.Appx. at 701 ; Greenidge , 446 F.3d at 361.
D. Scope of Claims Before the Court
Based on the foregoing, the Court need address only Whitt's claims of race discrimination based on pay disparity and race discrimination based on a reduction in job duties.
III. Exhaustion of Administrative Remedies
Defendant argues that Whitt's EEOC charge did not refer at all to claims of pay disparity, and, as a result, Whitt failed to exhaust his administrative remedies with respect to his claim that he was paid less than Caucasian workers.[2] (Dkt. 23-19 at 3-5). The Court disagrees.
*570 Whitt's charge of discrimination stated as follows:
I began working for the Respondent in or around June 1985. My latest position is that of Physiological Data Specialist.
Since I have been under the supervision of my current Manager, myself along with other African American employees have been subjected to a pattern of discriminatory behavior, where we have experienced disparity as well as abusive language. My manager has stated that he dislikes me and he also fails to communicate with me. I was also unfairly disciplined and suspended, while white employees who perform similar actions are not disciplined, nor are they suspended.
I have communicated my concerns to the Human Resources Department, yet nothing has been done to remedy the problems.
I believe myself along with other African Americans have been discriminated against because of our race/African American. This is in violation of Title VII of the Civil Rights Act of 1964 as amended.
(Dkt. 23-3 (EEOC Charge) ).
Although a plaintiff must exhaust administrative remedies before filing a Title VII action, "claims that were not asserted before the EEOC may be pursued in subsequent federal court action if they are reasonably related to those that were filed with the agency." Legnani v. Alitalia Linee Aeree Italiane, S.P.A. , 274 F.3d 683, 686 (2d Cir. 2001) (emphasis added). "A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Fitzgerald v. Henderson , 251 F.3d 345, 359-60 (2d Cir. 2001) (quoting Butts v. N.Y.C. Dep't of Hous. Pres. & Dev. , 990 F.2d 1397, 1401 (2d Cir. 1993) ). "The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination of the type alleged in the civil complaint." McCullough v. Xerox Corp. , 942 F.Supp.2d 380, 383-84 (W.D.N.Y. 2013) (citations, alterations, and quotations omitted).
Applying those principles to the present case, the Court concludes that Whitt has exhausted his pay disparity claim. The EEOC charge alleges that he "experienced disparity." (Dkt. 23-3). The pay disparity claim fell within the scope of the EEOC investigation following the charge, as evidenced by the EEOC Determination. (See Dkt. 20-1). In it, the EEOC stated, "Charging Party also alleges that African American employees have experienced disparate treatment to include abusive language and disparate pay " and "[a] review of those persons performing in the same capacity as the Charging Party reveals a pay disparity between African Americans and White employees." (Id. at 6-7). Accordingly, Whitt has exhausted his pay disparity claim.[3]
IV. Statute of Limitations
Defendant asserts that, "to the extent Whitt is complaining about any conduct that occurred more than 300 days prior to December 30, 2005, whether alleged in the EEOC complaint or otherwise, such conduct is also time-barred." (Dkt. 23-19 at 6).
*571 According to Defendant, because Whitt filed his EEOC charge on December 30, 2005, "any alleged discriminatory conduct occurring before March 5, 2005"-300 days before he filed the charge-"is not actionable." (Id. ).
Plaintiff agrees with Defendant that Whitt cannot prevail on Title VII claims for any actions that accrued before March 5, 2005. (Compare Dkt. 23-19 at 6, with Dkt. 30 at 5); see also 42 U.S.C. § 2000e-5(e)(1) (requiring employee to file charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice). However, Plaintiff maintains that he can prevail on claims as far back as December 30, 2002, "because he has also alleged a violation of the [NYSHRL]." (Dkt. 30 at 5). He argues that "the NYSHRL has a 3-year statute of limitations, which is tolled during the pendency of an EEOC investigation," and as a result, "Plaintiff can prevail on any claims that accrued on or after December 30, 2002"-three years before Whitt filed his EEOC charge-"because Title VII claims and NYSHRL claims are analyzed using the same standards." (Id. at 5-6). He further argues that any acts before December 30, 2002, are background evidence in support of timely claims. (Id. at 6).
As discussed above, Plaintiff's claims arise under both Title VII and NYSHRL. (Dkt. 20 at ¶ 1). "[T]he statute of limitations for claims brought pursuant to the New York State Human Rights Law is different than the statute of limitations for claims brought under Title VII." Sloth v. Constellation Brands, Inc. , 883 F.Supp.2d 359, 373 (W.D.N.Y. 2012). Specifically, "the statute of limitations for claims brought pursuant to Title VII is 300 days from the date on which an administrative complaint is brought before the EEOC," while "[u]nder the New York Human Rights Law, however, the limitations period runs for three years from the date on which an action asserting Human Rights Law violations is filed." Id. (citing, inter alia , CPLR 214(2) ).
Although the Second Circuit appears not to have weighed in on the issue, "numerous courts have concluded that NYSHRL claims are tolled during the pendency of an EEOC proceeding." Celmer v. Livingston Int'l, Inc. , No. 12-CV-00539, 2013 WL 951530, at *6 (W.D.N.Y. Mar. 12, 2013) (collecting cases); see also Sloth , 883 F.Supp.2d at 373 (concluding that the three-year limitations period is tolled "for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter" (quoting DeNigris v. N.Y.C. Health & Hosps. Corp. , 861 F.Supp.2d 185, 192 (S.D.N.Y. 2012) ). The rationale for such tolling is that, because CPLR 204(a) tolls the statute of limitations for any complaint filed with the New York State Division of Human Rights, and because complaints filed with the EEOC are deemed to be cross-filed with the New York State Division of Human Rights, tolling must apply. See Manello v. Nationwide Mut. Ins. Co. , No. 11-CV-0243 SJF, 2012 WL 3861236, at *11 (E.D.N.Y. Sept. 4, 2012) ; Sundaram v. Brookhaven Nat. Labs. , 424 F.Supp.2d 545, 565 (E.D.N.Y. 2006) ("Because complaints filed with the EEOC are deemed constructively to be cross-filed with the NYDHR, the statute [of limitations applicable to NYSHRL] is also tolled [pursuant to CPLR 204(a) ] during the pendency of a claim filed with the EEOC").
Here, Plaintiff filed his EEOC charge on December 30, 2005. (Dkt. 20-1 at 2 (showing EEOC charge date-stamped as received on December 30, 2005) ). The EEOC issued a right-to-sue letter on March 17, 2015. (Id. at 9). Plaintiff filed his federal complaint on June 16, 2015. (Dkt. 1). Thus, the limitations period on Whitt's NYSHRL claims is tolled by nine years, two months, two weeks, and three days-the *572 time when his EEOC charge was pending before the EEOC. The three-year limitations period, with the addition of the tolling period of nine years, two months, two weeks, and three days, renders NYSHRL claims based on events after March 31, 2003, timely. See, e.g., Sloth , 883 F.Supp.2d at 373.
As to Plaintiff's claim of race discrimination based on a reduction in job duties, Plaintiff's counterstatement of undisputed facts describes the complaint as follows:
The Complaint does not only allege that the demotion occurred after he received discipline stemming from the September 2005 incident , as Kaleida contends, but also that he was demoted upon his return to work in February 2003 following Mr. Whitt's leave of absence that began in October 2000, including having his position broken up and his authority reduced and having supervisory job duties taken away, including the oversight of technicians who performed preventative maintenance.
(Dkt. 29 at ¶ 11 (emphasis added) (citing Dkt. 20 at ¶¶ 8, 14, 17-18) ). In paragraph 14 of the complaint, Plaintiff alleges that, when he returned from a medical leave of absence that began in 2000, he "was no longer the Data Specialist for all five hospitals. Defendant had promoted four Senior Techs, all Caucasian, into the other four positions." (Dkt. 20 at ¶ 14). In paragraph 17, he similarly alleges that, when he returned from that medical leave, others had "taken part of his job." (Id. at v 17). In paragraph 18, he alleges as follows:
Mr. Whitt lost additional duties after he returned to work and this continued in 2005 . Mr. Rick Seaton, displaced from Brooks Memorial Hospital, was brought to Buffalo General Hospital and placed into a Senior Tech position that supervised a Preventative Maintenance team throughout the Kaleida system. Prior to this, Mr. Whitt and other techs performed PM duties.
(Id. at ¶ 18 (emphasis added) ). Of those allegations that, according to Plaintiff, relate to his claim of reduction in job duties, only the allegations relating to a reduction in job duties in 2005 would be timely under Title VII and NYSHRL. The remaining allegations set forth in paragraphs 14 and 17 concern a reduction in job duties in February 2003 and, therefore, are untimely under both Title VII and NYSHRL. Accordingly, only Whitt's claim of a reduction in job duties in 2005 is before the Court and not time barred.
As to Plaintiff's claim of race discrimination based on a pay disparity, additional considerations affect the analysis of whether those claims are timely under either Title VII or NYSHRL. Under the Lilly Ledbetter Fair Pay Act of 2009, a Title VII claim for disparate pay accrues with each paycheck:
[A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.
42 U.S.C. § 2000e-5(e)(3)(A) ; see Davis v. Bombardier Transp. Holdings (USA) Inc. , 794 F.3d 266, 271 (2d Cir. 2015) (holding that an employee's claim for discrimination based on a demotion that led to lower wages fell outside the scope of the Ledbetter Act).[4] Congress passed the Ledbetter *573 Act to overrule the Supreme Court's decision in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), in which it rejected the notion that each paycheck is an act of discrimination. Id. at 269-70. As a correction of that interpretation, "[t]he Ledbetter Act makes it unlawful to apply a discriminatory compensation decision to an employee and starts a new statute of limitations clock with each paycheck that reflects that decision." Davis , 794 F.3d at 269. Accordingly, "a compensation claim under the statute accrues not only at the time of the discriminatory decision but also with each paycheck the victim receives." Id.
As for NYSHRL claims of pay disparity, a district court in the Eastern District of New York has concluded that courts should apply the Ledbetter Act to claims of disparate pay arising under state law. See Husser v. N.Y.C Dep't of Educ. , 137 F.Supp.3d 253, 264 (E.D.N.Y. 2015). The Husser court observed that, although Congress did not amend state law and the New York state legislature did not act a similar law, the principle that federal and state civil rights law are to be construed similarly means that the Ledbetter Act should apply to state pay discrimination claims. Id. The court reasoned as follows:
It would ... be anomalous to hold that because Congress-in acting to correct what it viewed as the Supreme Court's incorrect interpretation of Title VII in Ledbetter by changing the text of the federal statute the Court considered-had not also acted ultra vires to change state law, that a federal court should continue to give state law a construction parallel to the now-rejected construction of prior federal law. Instead, it makes more sense, and is more faithful to controlling law, to continue to construe the two laws similarly and therefore to construe a claim of pay discrimination to assert a continuing violation under both. That is exactly what a number of state courts in New York have concluded in interpreting the NYSHRL in the aftermath of the Ledbetter Act.
Id. (citing state court decision). In so holding, the Husser court rejected the reasoning of another district court in the Eastern District of New York: Russell v. County of Nassau , 696 F.Supp.2d 213, 230 (E.D.N.Y. 2010). Husser , 137 F.Supp.3d at 264. In a brief passage, the Russell court concluded that, because the New York state legislature had not enacted a statute similar to the Ledbetter Act, claims for salary discrimination under the NYSHRL ... are governed by the Supreme Court's analysis in Ledbetter ." Russell , 696 F.Supp.2d at 230.
The Husser court's approach is consistent with a number of state courts in New York that have also concluded that the Ledbetter Act should apply to state pay discrimination claims. For example, a trial court in Supreme Court, New York County held that "the statute has been found to apply to discrimination claims brought under state and city law." Williams v. Deutsche Bank Grp. , No. 151112/12, 2013 WL 1455924, at *6 & n.1 (Sup. Ct. N.Y. County Apr. 4, 2013) (expressly rejecting reasoning of Russell and collecting cases applying Ledbetter Act to state claims); see also Finkel v. N.Y.C. Hous. Auth. , No. 108091/2010, 2010 WL 4530228, at *6-7 (Sup. Ct. N.Y. County Oct. 21, 2010) ("[C]ourts applying state law have applied the Supreme Court's Ledbetter analysis, and have since assumed that analysis under *574 the Act applies to state cases." (citations omitted) ).
Based on the foregoing federal and state court authorities, the Court assumes, without deciding, solely for purposes of this Decision and Order, that the principles of the Ledbetter Act govern Whitt's NYSHRL claims, and each paycheck is a cognizable act of discrimination. Applying those principles to the instant case, the Court concludes that some of Plaintiff's claims of pay disparity are time-barred. Specifically, under Title VII, claims of pay disparity arising out of paychecks received before March 5, 2005, are time barred. Under NYSHRL, due to the tolling provisions discussed above, claims of pay disparity arising out of paychecks received before March 31, 2003, are time barred. See Mohamed v. NYU , No. 14 Civ. 8373 (GBD)(MHD), 2015 WL 5307391, at *3 (S.D.N.Y. Sept. 10, 2015) (concluding that NYSHRL statute of limitations is tolled while EEOC charge is pending, and concluding that NYSHRL claim for discriminatory payment of wages was partially time barred based on an earlier cutoff than Title VII claims).
V. Plaintiff's Race Discrimination Claims
Race discrimination claims are assessed under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green , 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff has the initial burden to establish a prima facie case of discrimination. See id. at 802, 93 S.Ct. 1817. To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. See id. The defendant then has the burden to articulate a legitimate, non-discriminatory reason for the adverse employment action that the plaintiff suffered. See id. at 802-03, 93 S.Ct. 1817. Then, if the defendant meets that burden, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a mere pretext, and that discrimination was the true motivation for the adverse employment action. Id. at 804, 93 S.Ct. 1817.
A. Racially Discriminatory Disparate Pay
To make out a prima facie case of disparate pay under Title VII, a plaintiff must show the following: (1) he is a member of a protected class; (2) he was paid less than similarly situated non-members of his class for work requiring substantially the same responsibility; and (3) evidence of discriminatory animus. Belfi v. Prendergast , 191 F.3d 129, 139 (2d Cir. 1999) ; accord McCullough v. Xerox Corp. , 224 F.Supp.3d 193, 199 (W.D.N.Y. 2016) ("[I]n order to make out a prima facie case of disparate treatment based on unequal wages, plaintiff must show: (1) that she is a member of a protected class; (2) that she was paid less than similarly-situated workers who are not members of that protected class; and (3) that circumstances surrounding the pay disparity suggest intentional discrimination."). A prima facie claim of disparate pay under NYSHRL is subject to the same requirements. See Bentivegna v. People's United Bank , No. 2:14-cv-599 (ADS)(GRB), 2017 WL 3394601, at *17 (E.D.N.Y. Aug. 7, 2017), on reconsideration in part , No. 2:14-cv-599(ADS)(GRB), 2017 WL 4277149 (E.D.N.Y. Sept. 25, 2017).
With respect to the fourth element, "in order to evade summary judgment, plaintiff must produce evidence sufficient to convince a reasonable trier of *575 fact that [his] employer acted with discriminatory animus." McCullough , 224 F.Supp.3d at 199 (concluding no reasonable trier of fact could find pay disparities attributable to intentional discrimination and granting summary judgment for employer on Title VII unequal pay claim). Moreover, on the fourth element, the plaintiff "at all times bears the ultimate burden of proof." Belfl , 191 F.3d at 140.
The first element of Whitt's prima facie case is not in dispute; as an African American, he is a member of a protected class. (See, e.g. , Dkt. 23-19 at 7 n.2). And even if the Court assumes that the comparators Whitt identifies are appropriate-including Seaton, Bellanti, and Wisniewski, who, according to Defendant, are not appropriate comparators-and that Whitt was paid less than the similarly situated Caucasian Clinical Engineering Specialists, Whitt has produced no evidence that Kaleida Health deliberately paid him less than any of his alleged comparators because of his race. Instead, he appears simply to rely on the fact that the comparators were Caucasian and were paid more than he was paid. (See Dkt. 30 at 16 (arguing that there is an inference of discrimination for the disparate pay claim because Whitt was not paid as the third most senior Clinical Engineering Specialist) ). That is insufficient. See McCullough , 224 F.Supp.3d at 199 ; see also Tomka v. Seller Corp. , 66 F.3d 1295, 1313 (2d Cir. 1995) ("Tomka has failed to produce any evidence that Seiler paid her less than Abrams or the three account managers because of her gender. Rather, she relies on the fact that those employees were paid more than she was and that they are men. These facts do not support an inference that Seiler acted with a discriminatory intent, and Tomka's claims under Title VII and the HRL were therefore properly dismissed by the district court."), abrogated on other grounds by Burlington Indus., Inc., v. Ellerth , 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ; McNutt v. Nasca , No. 1:10-CV-1301 MAD/RFT, 2013 WL 209469, at *13 (N.D.N.Y. Jan. 17, 2013) ("Evidence that plaintiff's male colleagues were paid a higher salary than plaintiff is insufficient to demonstrate that the disparity resulted from intentional sex-based discrimination.").
It is well settled that claims of disparities in pay, without more, are insufficient to demonstrate discriminatory animus, and plaintiff has produced no direct or circumstantial evidence of ... race-based animus, such as evidence of derogatory remarks, toleration of offensive language or racial slurs, or other discriminatory actions by [the employer].
McCullough , 224 F.Supp.3d at 199 ; see also Fayson v. Kaleida Health, Inc. , No. 00-CV-0860E(SR), 2002 WL 31194559, at *6 (W.D.N.Y. Sept. 18, 2002) ("The wage disparity, standing alone, however, is insufficient to survive Kaleida's motion for summary judgment."), aff'd , 71 Fed.Appx. 875 (2d Cir. 2003). Accordingly, Defendant's motion for summary judgment is granted with respect to Plaintiff's Title VII claim arising out of racially discriminatory disparate pay.
B. Racially Discriminatory Reduction in Job Duties
As discussed above, to establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. See McDonnell Douglas , 411 U.S. at 802, 93 S.Ct. 1817. Once again, Defendant does not dispute that Whitt was a member of a protected class. (See, e.g. , Dkt. 23-19 at 7 n.2). Rather, Defendant's primary objection to Whitt's claim arising out of the reduction in his job duties is that he did *576 not actually lose any job duties and thus did not suffer an adverse employment action. (Id. at 14-15).
Whitt's job duties claim suffers from the same infirmity as his disparate pay claim. Even assuming that Whitt satisfied the second and third elements of a prima facie case, he cannot satisfy the fourth element, which is to demonstrate that the reduction in his job duties occurred under circumstances giving rise to an inference of discrimination. The Second Circuit has explained the circumstances which would permit a rational trier of fact to infer a discriminatory motive as follows:
Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position, or the employer's criticism of the plaintiff's performance in ethnically degrading terms, or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group, or the sequence of events leading to the plaintiff's discharge, or the timing of the discharge.
Dunn v. URS Corp. , 705 Fed.Appx. 32, 33 (2d Cir. 2017) (quoting Chambers v. TRM Copy Ctrs. Corp. , 43 F.3d 29, 37 (2d Cir. 1994) ). As discussed below, Whitt has not presented any such evidence that racial discrimination motivated his employer's decision to reduce his job duties.
In opposition to summary judgment, Whitt argues that he "had his job duties taken away by Mr. Castronova, Caucasian, and given to other less-qualified, less senior Caucasians, for no justifiable basis." (Dkt. 30 at 17). Aside from his conclusory statement, he offers no evidence to support that argument or his contention that the reduction in his job duties after the discipline he received in September 2005 occurred under circumstances giving rise to an inference of discrimination based on race. In his counterstatement of material facts, Whitt concedes that he "did not identify specific remarks concerning his race, but he did allege general derogatory words and actions in the same context that he requested human resources speak with African Americans." (Dkt. 29 at 63). Without evidentiary support, this is insufficient to meet his burden. Moreover, the record establishes that the complained-of reduction of job duties-removing his status as the sole point person and having to share this task with all employees in his title-followed a disciplinary incident. Accordingly, Plaintiff has not set forth circumstances giving rise to an inference of discrimination, and his discrimination claim arising out of a material reduction in job duties fails. The Court therefore grants Defendant's summary judgment motion with respect to this claim.
CONCLUSION
For the reasons set forth above, the Court grants Defendant's summary judgment motion in its entirety. The Clerk of Court is directed to close the case.
SO ORDERED.

Citations to "Def. Stmt." refer to Defendant's Local Rule 56 Statement of Undisputed Facts (Dkt. 23-1), while citations to "Whitt Stmt." refer to Plaintiffs Counterstatement of Facts Under Local Rule 56 (Dkt. 29).
Whitt's Counterstatement of Facts Under Local Rule 56 does not comply with Local Rule of Civil Procedure 56(a)(2)'s requirement to "include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried." L.R. Civ. P. 56(a)(2). The Court cites individual paragraphs as they correspond to Defendant's Local Rule 56 Statement of Undisputed Facts, even if Whitt included his corresponding response to a specific paragraph within a range of paragraphs. For example, as seen on page 4 of Whitt's Counterstatement of Facts Under Local Rule 56, he responds to paragraphs "15-17, 37, 44" in a single paragraph. (Dkt. 29 at 4). The Court will cite this paragraph as "Whitt Stmt. at ¶ 16," for example, if addressing Defendant's paragraph 16.

Defendant argues that Whitt's EEOC charge "did not make any reference to [being] denied promotion, training, or overtime opportunities, nor did he complain about his work location or any alleged pay disparity." (Dkt. 23-19 at 5). Thus, Defendant appears not to argue that Whitt failed to exhaust his claim of a reduction in job duties. (See id. ). Consistent with that position, Plaintiff's opposition brief discusses exhaustion of only his pay disparity claim. (See Dkt. 30 at 3-5).

In raising this argument, Defendant represents that Whitt was represented by counsel during the EEOC proceedings, and as a result, "a liberal construction of his EEOC charge is not required." (Dkt. 23-19 at 5 n.1). Whitt clarifies that he filed the EEOC charge pro se and did not have counsel until later in the EEOC proceedings (Dkt. 30 at 4-5). Regardless, for the reasons discussed above, the Court concludes that Whitt exhausted the pay disparity claim.

The Ledbetter Act applies retroactively "to all claims of discrimination in compensation under title VII ...that are pending on or after" May 28, 2007. Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5. Because Whitt's claim of discrimination was pending as of that date, the Ledbetter Act applies to Whitt's claims.